UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ELLIOTT D. LEVIN as Chapter 7 Trustee for Irwin Financial Corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 1:11-cv-01264-SEB-MPB |
| vs. | ) ) | |
| WILLIAM I. MILLER, GREGORY F. EHLINGER, THOMAS D. WASHBURN, | ) ) ) ) | |
| Defendants. | ) | |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on Defendants' Motion for Summary Judgment [Docket No. 177], filed on May 17, 2016, pursuant to Federal Rule of Civil Procedure 56. Plaintiff Elliott D. Levin, as Chapter 7 Trustee ("the Trustee") for Irwin Financial Corporation ("Irwin"), brought this suit against three of Irwin's former directors and officers, Defendants William I. Miller, Gregory F. Ehlinger, and Thomas D. Washburn (collectively, "the Managers"), alleging that Defendants breached their fiduciary duties to Irwin in various ways. For the reasons detailed below, we GRANT Defendants' Motion for Summary Judgment.

## General Factual and Procedural Background

During the time period relevant to this litigation, Irwin was a public company that functioned as a holding company for two banks: Irwin Union Bank and Trust Company ("Union Bank & Trust") and Irwin Union Bank, FSB ("Union Bank, FSB") (collectively,

"the Banks").  Beginning in the early 2000s, the Banks became heavily involved in the residential mortgage and commercial real estate markets.  To advance this business, Union Bank & Trust had subsidiaries including Irwin Home Equity Corporation ("Irwin Home"), which engaged in nationwide consumer lending, and Irwin Mortgage Corporation ("Irwin Mortgage"), which engaged in nationwide mortgage banking activities.

On September 18, 2009, in the aftermath of the real estate collapse in 2007, bank regulators closed Union Bank & Trust and Union Bank, FSB after they lost substantial sums as a result of bad loans and investments.  The Federal Deposit Insurance Corporation ("FDIC") was appointed receiver over the Banks.  That same day, Irwin filed a voluntary petition for bankruptcy and Plaintiff Elliot Levin was appointed Chapter 7 trustee for the Irwin Estate to oversee its liquidation.

At all times relevant to this litigation, Irwin was governed by a ten-member board of directors ("the Board").  Irwin's bylaws also provided that one officer would be chosen from among the directors to act as Chairman of the Board and Chief Executive Officer.  Defendant Miller began serving as a director of Irwin in 1985 and was appointed as Chairman of the Board and Chief Executive Officer in 1990.  Defendant Ehlinger served as Irwin's Chief Financial Officer throughout the relevant time period.  Defendant Washburn served as Irwin's Executive Vice President from early 2000 until January 2008.

The Trustee filed this action on September 16, 2011, alleging in seven counts that as former senior officers of Irwin, Defendants breached their fiduciary duties to the

corporation.  On September 27, 2012, we dismissed the Trustee's complaint on standing grounds, holding that the Trustee lacked standing to bring any of the claims alleged because they all belonged exclusively to the FDIC.  The Trustee appealed our decision, and, on August 14, 2014, the Seventh Circuit affirmed the dismissal of five of the seven claims, but ruled that the Trustee had standing to bring the remaining two claims.  The case was therefore remanded for consideration of the remaining two claims on their merits.

In Count I (originally Count III), the Trustee alleges that Defendants violated their fiduciary duty of care to Irwin by failing to have in place a proper risk monitoring and assessment system and internal controls to ensure that financial information and projections provided to the Board would be accurate and reliable.  The Trustee claims that, as a result of Defendants' failure, the Board acted on the basis of inaccurate and unreliable financial information, which led it to improvidently approve dividends, stock repurchases, and other distributions in 2006 and 2007, when it should have instead preserved capital.

With regard to Count II (originally Count VII), the Trustee claims that Defendants Miller and Ehlinger breached their duties of care and loyalty to Irwin by "capitulating to bank regulators" in 2009 and causing Irwin to contribute millions of dollars in capital to two of its subsidiary banks when Defendants knew or should have known that such an act was futile and would not benefit Irwin, given the low likelihood that the Banks would survive.  As the Seventh Circuit observed, the claim is essentially that Defendants "threw good money after bad."  *Irwin v. Levin*, 763 F.3d 667, 671 (7th Cir. 2014).

Defendants moved for summary judgment on both of these claims on May 17, 2016. That motion is now fully briefed and ripe for ruling. We have detailed the facts relevant to each count more fully below as necessary.

## Legal Analysis

### I.     Standard of Review

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. See *id.* at 255. However, neither the mere existence of some alleged factual dispute between the parties, *id.* at 247, nor the existence of some metaphysical doubt as to the material facts, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Thus, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enter., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but it is mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 323.

## II.   Count I

In Count I, the Trustee alleges that Defendants violated their fiduciary duties to Irwin by presenting inaccurate financial information and unreliable financial projections to the Board, which led the Board to approve dividends, stock repurchases, and other distributions in 2006 and 2007, when Irwin should have instead preserved capital. Defendants argue that summary judgment should be entered in their favor on Count I for three reasons: (1) the statute of limitations bars claims to recover all of the distributions

except for the payments approved in the fourth quarter of 2007; (2) the distributions to the shareholders do not constitute a loss that is recoverable under Indiana law by any corporate constituency represented by the Trustee; and (3) even if such a theory of recovery existed under Indiana law, Defendants' actions are protected by Indiana's business judgment rule as well as the indemnification standard set forth under Irwin's bylaws.  Because we find, for the reasons detailed below, that Indiana law does not support the Trustee's theory of recovery in the circumstances presented here, we need not address Defendants' alternative arguments in support of summary judgment.[1]

A bankruptcy trustee serves the interests of two constituencies of an insolvent corporation – its creditors and its shareholders.  *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) ("[T]he fiduciary duty of the trustee runs to shareholders as well as to creditors.").  On the facts before us, however, the Trustee cannot recover the 2006 and 2007 distributions on behalf of either Irwin's shareholders or its creditors under Indiana law.  Defendants are therefore entitled to summary judgment on Count I.

With regard to shareholder interests, the Seventh Circuit previously recognized that one "potential problem" with Count I is "whether Indiana law permits recovery on a theory that a holding company distributed 'too much' to its investors."  *Levin v. Miller*,

---

[1] Moreover, because our decision is based on the deficiencies in the Trustee's theory of recovery rather than the underlying facts related to Defendants' conduct, we need not and do not provide a full recitation of those facts here.

763 F.3d 667, 671 (7th Cir. 2014).  We find no support under Indiana law for recovery on

such a theory.  As Defendants argue, the Trustee cannot recover shareholder distributions

for the benefit of the very shareholders who received those distributions, as such a result

would equate to a double recovery on behalf of the shareholders.  The Trustee does not

argue otherwise.

Nor can the Trustee recover on behalf of Irwin's creditors under Indiana law.  In

support of Count I, the Trustee originally argued both here and on appeal that "when a

corporation is encountering financial difficulties … the supervening duty of corporate

fiduciaries is to the corporation – a duty to maximize the value of the corporation for the

benefit of all stakeholders."  Dkt. 118 at 9; *see also* 7th Circuit Case 12-374, Dkt. 15-1 at

44-45 ("[I]f the capital in question had not been dissipated as alleged in Count [I], [Irwin]

would have been correspondingly less insolvent when the Banks failed, and the funds in

question would have been available to be applied to Irwin's debts.").  It is true that in

certain jurisdictions "a director owes a fiduciary duty to creditors if the corporation is

insolvent and no longer a going concern."  *Geiger & Peters, Inc. v. Berghoff*, 854 N.E.2d

842, 850 (Ind. Ct. App. 2006).  However, Indiana has rejected this "trust fund" or "zone

of insolvency" theory that "insolvent … corporations … hold their property in trust for

their creditors."  *Id.*; *see also Abrams v. McGuireWoods LLP*, 518 B.R. 491, 502 (N.D.

Ind. Bankr. 2014) (recognizing that "Indiana … has completely rejected the trust fund

theory.").

In response to this clear precedent, the Trustee has shifted his position to now assert that his claims are not derived from Irwin's shareholders or creditors, but rather are based "on the recognition that the primary object of a corporate fiduciary's duties is the corporation itself."  Dkt. 197 at 21-22.  While it is true that the Trustee may "stand in the shoes" of the corporation and act on behalf of the estate, this does not change the fact that the interests served by the Trustee are those of the only residual beneficiaries of any increase in value of the corporation, to wit, the shareholders and creditors.  For the reasons stated previously, payment to the stockholders here would result in a double recovery and Indiana law does not recognize a duty on the part of corporate fiduciaries to creditors post-insolvency.  Accordingly, neither constituency served by the Trustee can recover the subject distributions, given the facts before us, and Defendants are therefore entitled to summary judgment on Count I.[2]

## III.    Count II

In Count II, the Trustee asserts that Defendants Miller and Ehlinger breached their duties of care and loyalty to Irwin by capitulating to the pressure of bank regulators and causing Irwin to make capital contributions to the Banks in 2009 without considering whether such contributions were in Irwin's best interest, given the Banks' precarious

---

[2] The case that the Trustee cites in support of his position that the corporation owns a claim apart from the shareholders or creditors, *Production Resources Group, LLC v. NCT Group, Inc.*, 863 A.2d 772 (Del. Ch. 2004), is inapposite.  In *Production Resources*, the Delaware Chancery Court addressed the question of whether a creditor was entitled to bring direct claims against corporate fiduciaries under Delaware law.  The court's analysis was based on the trust fund doctrine, which, as discussed above, has been soundly rejected under Indiana law.

financial situation.  The contributions at issue occurred in January 2009 ($14 million) and June 2009 ($3.5 million), and include an "eschew[ed] opportunity in June 2009 upon receipt of a tax refund to replenish [Irwin's] cash by $30 million by adjusting intercompany accounts."  Comp. ¶ 73.  The facts relevant to our disposition of Count II are as follows:

### A.    Relevant Facts

#### 1.    Governing Regulatory Agencies

At all relevant times, Irwin was registered as a bank holding company with the Board of Governors of the Federal Reserve System ("Board of Governors") under the Bank Holding Company Act of 1956 ("BHC Act") and was subject to the Federal Reserve's supervision.  Acknowledging this supervisory relationship, in 2006, Irwin publicly disclosed that "[t]he Federal Reserve expects us to act as a source of financial strength to our banking subsidiaries and to commit resources to support them.  In implementing this policy, the Federal Reserve could require us to provide financial support when we otherwise would not consider ourselves able to do so."  2006 10-K at 8.

Union Bank & Trust was a state-chartered member of the Federal Reserve System and, along with its subsidiaries, was subject to the Federal Reserve's and the Indiana Department of Financial Institution's ("DFI") supervision.  As the primary federal regulator of Union Bank & Trust, the Federal Reserve had broad authority under the Federal Reserve Act to oversee the banking activities of Union Bank & Trust and its subsidiaries.  The Federal Reserve also had broad authority pursuant to the BHC Act over

the activities of Irwin's non-banking subsidiaries.  Union Bank, FSB was a federally chartered savings bank and was governed by and subject to regulation, examination, and supervision by the Office of Thrift Supervision.  Additionally, the Banks were supervised and examined by the FDIC because their deposits were insured under provisions of the Federal Deposit Insurance Act.

### 2.    Independence of the Board

According to Defendants, since at least 2004, the Board had a supermajority (more than 75%) of "independent" directors under the standards required by the New York Stock Exchange, Irwin's Corporate Governance Principles, and its securities provisions. The Trustee contends, however, that at all relevant times, Mr. Miller controlled almost 40% of Irwin's voting stock.

It was the Board's practice to hold an executive session after each Board meeting without Mr. Miller or any other member of management present.  At those meetings, the Board would identify and discuss various concerns and recommendations that would later be presented to Mr. Miller.

### 3.    Focus on Capitalization

The time period relevant to Count II begins in early 2008 and extends through July of 2009.  In early 2008, the real estate market throughout the United States had already begun to collapse and the Banks, which specialized in the types of mortgages hardest hit by the real estate crisis, were experiencing financial struggles.  On February 28, 2008, a special meeting of the Board was held at which a representative from the Federal Reserve Bank of Chicago ("the Reserve Bank") joined by telephone to discuss "regulatory

concerns about Bank liquidity and the parent company's expected role as a source of strength for the Bank" in providing capital and liquidity.  Defs.' Exh. I-1 at 3.  Following this meeting, the Board recognized the need to "maintain[] adequate capital" and to "provide protection to [Union Bank & Trust's] depositors."  *Id.* at 7; Defs.' Exh. R ¶¶ 12-13; Defs.' Exh. S ¶¶ 10-11.

A few months later, in April 2008, the Board authorized management to engage an investment banker, Stifel Nicolaus, to pursue several capital-generating options, including raising private capital.  Around that same time, the Board sought to hire legal counsel in order to ensure it was taking appropriate action to oversee Irwin.  The Board engaged the New York firm of Sullivan & Cromwell to advise "on all issues related to recapitalization and Board duties."  Defs.' Exh. H at 4.  The lead attorney from Sullivan & Cromwell who advised the Board on these issues was Rodgin Cohen.  Mr. Cohen was hired to provide counsel to the Board, and the Board expected Irwin's management to follow the advice of Mr. Cohen and his colleagues.  After engaging Mr. Cohen, the Board conducted meetings each Friday, most of which Mr. Cohen was in attendance.  His colleague, Ms. Whitney Chatterjee, also often attended these meetings.

### 4.    Memorandum of Understanding and Written Agreement

In May 2008, representatives from the Reserve Bank and the Indiana Department of Financial Institutions ("DFI") advised the Board and Irwin's management by letter that Union Bank & Trust was in "troubled condition" and that supervisory action would follow.  Defs.' Exh. M at 15.  In July 2008, the regulators sent the Board a Memorandum

11

of Understanding ("MOU") as an informal supervisory action,[3] detailing actions they wanted Irwin to take to address their concerns, including obtaining a $50 million cash infusion by August 31, 2008, and "mak[ing] capital contributions to the Bank as necessary or upon the request of the Reserve Bank and DFI."  *Id.* at 53 ¶ 6(c).  Upon receipt of this letter, Mr. Cohen "advised the Board … to direct management to sign and deliver the MOU to the regulators."  Exh. I-2 at 2.  The Board subsequently did so.

Irwin was unable to obtain the $50 million cash infusion by the timetable set forth in the MOU, prompting regulators on September 29, 2008 to issue to Irwin a formal "Written Agreement."  The Written Agreement required Irwin and Union Bank & Trust to submit to the Reserve Bank and DFI within thirty days a joint capital plan to "ensure that Irwin, on a consolidated basis, and the Bank, as a separate legal entity on a stand-alone basis, maintain sufficient capital."  Defs.' Exh, M at 75, 80.

### 5.   TARP Application

In early October 2008, Congress enacted the Emergency Stabilization Act of 2008, creating the Troubled Asset Relief Program ("TARP"), which authorized the Treasury Department to purchase troubled assets from financial institutions after considering various factors, including "the long-term viability of the financial institution."  12 U.S.C. § 5213(4).  Under TARP, the regulatory agencies had the discretion to develop criteria for determining whether a bank was "viable," including whether any TARP funds granted

---

[3] As an informal supervisory action, a MOU is not a legally enforceable undertaking and cannot serve as a basis for assessing a civil monetary penalty or initiating a proceeding to remove a director/officer or prohibit them from working in the banking industry.

to an institution could be included in the viability analysis.  Mr. Cohen advised the Board that TARP should "be viewed as a work in process" as the legislation was enacted quickly and "without time for a lot of thought."  Defs.' Exh. I-2 at 12.

At the Board's October 3, 2008 meeting, Mr. Miller informed the Board that, if Union Bank & Trust's capital classification ever fell below "well capitalized," its deposit base would become severely constrained and the Bank likely would not survive.  Tr. Exh. F at 5.  At the October 10, 2008 Board meeting, Ms. Chatterjee advised the Board that it was important to follow Indiana law regarding Board duties, that the Board had no obligation to favor depositors over other stakeholders, and that doing so without a supportable reason could create legal liability for directors and management.  Defs.' Exh. I-2 at 5.  Ms. Chatterjee also advised the Board that the "best approach" to discharging its fiduciary duties was "to ensure the bank remains solvent" and making "every effort" to "accomplish the plans already set forth by the Board" to keep the Banks capitalized.  *Id.* During this meeting, the Board approved the Written Agreement and authorized Mr. Miller to sign and deliver it.  *Id.* at 8.

On November 7, 2008, the Board authorized the submission of Irwin's TARP application to participate in the Treasury Department's Capital Purchase Program.  The Reserve Bank assisted in preparing the application, which sought $148 million in TARP funds.  *Id.* at 17-18.  Irwin submitted the TARP application on November 11, 2008.  At approximately the same time, Barack Obama was elected President.  At the November 21, 2008 Board meeting, Irwin's investment banking advisor, Patrick Koster of Stifel Nicolas, informed the Board that he continued to believe that "the best hope rides on

13

TARP," but that TARP had been put on hold until January 2009, when President Obama would take office and that "waiting for a new direction from a new administration may be the only available practical alternative."  *Id.* at 27.

Also at the November 21, 2008 Board meeting, Irwin's management advised that a bank with a 4 or 5 CAMELS rating[4] would be considered for TARP only as part of an acquisition by another bank, regardless of the recommendation from its primary regulator.  The Board was also advised that the Reserve Bank was holding the TARP application until Irwin found a purchaser or the Treasury's policy changed.  As of that date, both Irwin and Union Bank & Trust had composite CAMELS ratings of 4.  Tr. Exh. E-2 at 8, 8, 34.

### 6.    $14 Million January 2009 Capital Contribution

Two weeks later, at the Board's December 4, 2008 meeting, the Board stated that "it anticipate[d] further efforts to preserve capital levels, particularly at [Union Bank & Trust] through continuing asset reduction efforts, reduced loan originations …, loan sales and parent contribution to equity capital where necessary."  Defs.' Exh. I-2 at 32.  At that

---

[4] Federal Banking regulators employ the Uniform Financial Ratings System, which is also known as the "CAMELS" rating system.  Under this system, financial institutions receive a numerical composite rating between one and five upon examination by a regulatory body, with one being the strongest score and five being the weakest.  For example, a rating of 1 reflects that the institution is "sound in every respect … and give[s] no cause for supervisory concern." *Uniform Financial Institutions Rating System*, 61 Fed. Reg. 67025-26.  A rating of 2 indicates that the institution is "fundamentally sound … [and] supervisory response is informal and limited." *Id.* at 67026.  A 3 rating indicates that the institution is "less capable of withstanding business fluctuations … [and] require[s] more than normal supervision." *Id.*  A rating of 4 indicates that the institution "exhibits unsafe and unsound practices or conditions …, [c]lose supervisory attention is required …, [and] [f]ailure is a distinct possibility," while a 5 indicates that the institution exhibits "extremely unsafe and unsound practices or conditions …, [o]ngoing supervisory attention is necessary …, [and] failure is highly probable." *Id.*

14

same meeting, the Board approved the 2009 budget and "authorized management to move additional equity capital from Irwin Financial Corporation into [Union Bank & Trust] prior to year-end and as necessary in order to maintain the well-capitalized status of the Bank."[5]  *Id.* at 34.

During the Board's January 29, 2009 special meeting, Mr. Miller informed the Board that Irwin had implemented the authorized capital infusion.  This $14 million capital contribution is one of the transfers being challenged by the Trustee in this litigation.

### 7.    Accounting Issue

In mid-December 2008, an accounting issue arose in relation to a proposed sale of residual loan interest as part of a Board-approved effort to reduce Union Bank & Trust's balance sheet.  On December 10, 2008, approximately one week after the Board authorized management to make the $14 million capital contribution to Union Bank & Trust before year's end, Mr. Miller informed the Board that "Ernst & Young [Irwin's independent outside auditing firm] have now concluded that, through a sale of the residual certificates and removing of serving rights and activities, we can remove these loans from the balance sheet under GAAP [Generally Accepted Accounting Principles]."

---

[5] Federal law vests federal bank regulators with various enforcement options called "Prompt Corrective Actions" that they may use when a bank's capital levels decline below certain defined capitalization thresholds.  *See* 12 U.S.C. § 1831o.  In descending order, the five capitalization thresholds are as follows: (1) Well Capitalized; (2) Adequately Capitalized; (3) Undercapitalized; (4) Significantly Uncapitalized; and (5) Critically Uncapitalized.  *Id.* § 1831o(b)(1).  As a bank's capital levels fall to a lower category, regulators can escalate their enforcement actions.

Defs.' Supp. Exh. H-1 at 2.  These residual certificates were sold on December 22, 2008. *Id.* at 21.

A month later, on or about January 16, 2009, the Board of Governors raised questions about the accounting treatment of the sale of these certificates (a treatment on which Ernst & Young had concurred with Irwin), and Mr. Ehlinger discussed the issue with the Board on that same date.  Defs.' Supp. Exh. I-3 at 3.  On January 22, 2009, Mr. Miller reported to the Board that the issue remained unresolved, including the fact that Ernst & Young disagreed with the Board of Governors' accounting position.  Defs.' Exh. H-1 at 30-31.  At the January 23, 2009 Board meeting, Mr. Ehlinger advised the Board that a change in the accounting treatment "would push [Union Bank & Trust's capital] ratios below well capitalized."  Defs.' Exh. I-2 at 73.

On January 29, 2009, Mr. Miller informed the Board that Ernst & Young still disagreed with the Board of Governors' interpretation of GAAP, but was adopting an alternative accounting position, different from the advice it had provided the Board in early December before the residuals were sold.  Defs.' Supp. Exh. H-1 at 35-36.  Mr. Ehlinger reported to the Board the next day at their January 30, 2009 meeting that Ernst & Young advised Irwin to seek guidance from the SEC on the issue.  Defs.' Supp. Exh. I-3 at 5-6.  On February 19, 2009, Mr. Miller provided the Board with an advance draft of the letter that was eventually sent to the SEC seeking guidance.  Defs.' Supp. Exh. H at 16; *see* Tr. Exh. I at 1.

The issue was not finally resolved until March 20, 2009, when the SEC issued guidance informing the Board that the loans at issue should be classified as loans held for

16

sale, rather than investment, and valued at the lower of cost or market. This classification resulted in an impairment charge of approximately $28 million and a reduction in Union Bank & Saving's total risk-based capital ratio. As a result, Union Bank & Trust fell from "well capitalized" to "adequately capitalized" status as of December 31, 2008. On March 31, 2009, Ernst & Young's issued an opinion based on Irwin's consolidated financial statements as of December 31, 2008, stating that substantial doubt existed about Irwin's ability to continue as a going concern. Tr. Exh. H at 754.

### 8.  TARP Updates – December 2008 to February 2009

At the December 17, 2008 Board meeting, the Reserve Bank informed management and the Board that they had downgraded Union Bank & Trust's CAMELS ratings from a 4 to a 5, but also stated that "[t]he Bank at this point in time is well capitalized." *Id.* at 65-66. The week prior, Mr. Cohen had informed the Board that he had seen banks with a 5 rating survive with additional capital and that such a rating would not necessarily result in the seizure of the Bank by the FDIC. *Id.* at 59. At that same time, Mr. Miller informed the Board that the Treasury Department had already approved TARP money for Central Pacific Financial in Hawaii, contingent on a capital raise. *Id.* at 60. Mr. Miller and Mr. Cohen kept the Board informed of their efforts to urge the Treasury transition team and members of Congress to adopt a "post-TARP viability test," which would take the TARP investment as well as private capital into consideration when assessing viability. *Id.*

Although Union Bank & Trust's 5 CAMELS rating made Irwin ineligible for TARP support, one of the Reserve Bank representatives informed the Board at the

December 17 meeting that the "criteria for [TARP] eligibility has not been static. Treasury wanted to have flexibility to have the opportunity to make adjustments along the way." *Id.* at 67. Mr. Odden requested assistance from the Reserve Bank in advancing Irwin's TARP application. The representative from the reserve Bank told the Board he could not promise that Irwin would receive TARP approval – indeed that it would be "extremely challenging" – but that it was "receptive to listening." *Id.* at 66-67. He further informed the Board that the $50 million equity raise being attempted by Irwin pursuant to the Written Agreement was "critically important," stating that if TARP were linked with the equity raise, "it brings a challenge." *Id.* at 67. By December 17, 2008, the commitments Irwin had obtained for the proposed equity raise were substantially less than $50 million and were specifically contingent on Irwin's obtaining TARP funds. *Id.* at 61.

On January 9, 2009, Mr. Miller and Director Lance Odden updated the Board on a meeting they had had with regulators during which they had asked what Irwin would need to do to gain the Reserve Bank's support of its TARP application. *Id.* at 69. They reportedly received no response to their inquiry. Mr. Cohen informed the Board that he perceived a lack of clarity among the regulators and Treasury in their joint administration of the TARP program. *Id.* at 70.

At the January 23, 2009 Board meeting, which occurred a few days after President Obama's inauguration, Mr. Cohen informed the Board that the Board of Governors staff "are clearly very busy but nevertheless focused on [Irwin]." *Id.* at 72. The Board also

discussed that "the new Treasury Secretary is expected to propose a comprehensive plan to change TARP within [the] next few weeks." *Id.*

### 9. 2009 Tax Allocation Agreement

Beginning in 1999, as was the practice at the start of each year, Irwin and its subsidiaries approved a "tax allocation agreement" based on bank regulators' interagency policy that governed the ability of bank holding groups to file consolidated tax returns. In early February 2009, the Board approved the 2009 Tax Allocation Agreement ("TAA"), which provided that each subsidiary's taxable income and net operating losses would be treated separately and that when a "[s]ubsidiary [i.e., Union Bank & Trust] has the ability to carry losses back to prior years when income was recognized, a refund will be given." Defs.' Exh. L at 2. The Trustee disagrees with this interpretation of the TAA, positing instead that, under the TAA, tax refunds were payable to and the property of Irwin. According to the Trustee, if a subsidiary were entitled under the TAA to payment from Irwin in respect of its tax attributes, that right was a debt Irwin owed to the subsidiary. *Id.* at 1-16.

In February 2009, Mr. Miller updated the Board by presenting various liquidity scenarios, including the anticipated tax refund "aiding liquidity." Defs.' Exh. H at 23. This anticipated tax refund related to Union Bank & Trusts' 2006 and 2007 losses that, under Defendants' interpretation of the TAA, the Bank could carry back and then seek a refund. *Id.* at 51 n.4.

### 10. TARP Updates – February 2009 through June 2009

19

Also in February 2009, the new U.S. Treasury Secretary announced a new TARP program. Although the plan did not include many specifics, it was reported that the TARP program would include "a public-private investment fund" to assist banks with declining assets. Defs.' Exh. H at 137-38. However, at the Board's February 13, 2009 meeting, Mr. Cohen reported that the net operating loss carry-back provisions that were a part of the stimulus bill that had been before Congress were subsequently removed in the joint conference session. Mr. Cohen informed the Board that such an outcome was "very negative" for Irwin. Defs.' Exh. I-2 at 75. The Board then asked Mr. Cohen to follow up with the Board of Governors regarding Irwin's TARP application. *Id.* at 76.

On February 19, 2009, federal and state regulators telephoned Mr. Miller and Mr. Odden in response to their January 7, 2009 inquiry regarding what it would take to gain the Reserve Bank's support for Irwin's TARP application. The regulators informed Mr. Miller and Mr. Odden that Irwin would be required to raise $150 million in private equity before the Reserve Bank would support the application, meaning that the Reserve Bank would apply a "pre-TARP viability" standard (i.e., determining viability without consideration of TARP funds). *Id.* at 78-79. Mr. Miller informed the Board in a February 19, 2009 memorandum that, based on this information, TARP funding would occur only in an "[o]ptimistic scenario." Defs.' Exh. H at 23.

Mr. Miller reported the content of this conversation to the Board at the February 20, 2009 meeting. The Board was informed by a representative of the Board of Governors that $150 million would be required for an upgrade to a 4 CAMELS rating, and that there was no guarantee that the interagency council would support TARP at a

20

level 4 rating, or, if support was forthcoming, that the Treasury would approve at level 4. The Board was told that Irwin could go to the interagency council with an equity target lower than $150 million, but the Reserve Bank could not support the application. Defs.' Exh. I-2 at 78-80. In the end, the Reserve Bank and the interagency council never gave a positive recommendation for Irwin's TARP application.

At the February 20 meeting, both Mr. Miller and the Board acknowledged that Irwin was running out of options. Mr. Miller "reviewed the alternative paths forward that have been identified to date, as well as their pros and cons." *Id.* at 80. Mr. Miller also presented Mr. Cohen's idea that "would involve going to FDIC and requesting facilitation of a takeover by another bank through a guarantee of losses without going through the process of failing first." *Id.*

In a February 27, 2009 memorandum, Mr. Miller updated the Board on a meeting he, Mr. Odden, Mr. Cohen, and Ms. Chatterjee had had with Deborah Bailey, the Deputy Director of the Board of Governors, to discuss Irwin's situation. Mr. Miller reported that Ms. Bailey "expressed an interest" in working with Irwin to "structure a creative solution." Defs.' Exh. H at 26. He noted that the next step for Irwin was to determine the maximum private capital it thought it could raise so that information could be conveyed to Ms. Bailey. *Id.* That same week, the Treasury Department announced details about TARP's new "CAP" program, which included pre-TARP viability criteria for smaller banks like Irwin, but indicated that there might be case-by-case exceptions for institutions that required "exceptional assistance," although it was not clear what the eligibility requirements for such exceptions would be. *Id.* at 28, 34.

21

During the February 27, 2009 Board meeting, Mr. Koster, a representative from Stifel Nicolaus, the investment bank retained by Irwin, stated that the possibility was "remote in the near term" that Irvin could secure a $150 million investment and opined that a plan based on that level of capital "does not make sense." Tr. Exh. F at 11. Mr. Koster believed that $50 million in capital, which included $37 million already conditionally committed, was the most Irwin could expect to raise. *Id.* At that same meeting, it was reported that "Treasury seems stuck on the idea that TARP participants must be unquestionably viable without TARP" (i.e., pre-TARP viability) in order to receive approval. *Id.* at 9. In its 2008 10-K, Irwin disclosed: "Although our application for participation in [TARP] is still pending, we believe it is unlikely to be approved absent a change in policy." Tr. Exh. H at 692.

In March, 2009, Mr. Cohen prepared a formal proposal to modify TARP's eligibility criteria in a manner that would allow banks to demonstrate eligibility based on post-TARP viability coupled with private equity. Defs.' Exh. H at 37. Mr. Miller delivered the proposal to multiple regulatory agencies, including the Bank Reserve, the DFI, the FDIC, and the Treasury. *Id.* Mr. Cohen reported to the Board that the "FDIC is working with Treasury to develop the new private/public partnership program to buy bad assets." Defs.' Exh. I-2 at 84.

In April 2009, Mr. Miller, Mr. Cohen, and Mr. Odden met with FDIC Chairperson Sheila Blair and her staff to discuss Mr. Cohen's proposal regarding TARP eligibility criteria. Ms. Blair indicated that she would consider Irwin's request and was sympathetic to the idea of using private capital as the basis for determining a bank's viability. She

22

also noted that Irwin's proposal was timely because the regulators were at that time turning to help smaller banks. Defs.' Exh. H at 66. After the meeting, Mr. Cohen followed up with Ms. Bailey from the Board of Governors and reported to the Board that Ms. Baily would support Irwin's proposal if the FDIC would. Defs.' Exh. I-2 at 87.

On May 7, 2009, regulators, including the FDIC, met privately with the Board's eight independent directors outside the presence of Defendants. During that meeting, the DFI reviewed the adverse consequences that would follow if Union Bank & Trust's capital levels dropped below the "Adequately Capitalized" standard. *Id.* at 89, 94-95. The FDIC explained its intervention, or "resolution," process to the Board and encouraged the Board to protect depositors in the event of a resolution. *Id.* at 94. The Reserve Bank told the Board that its biggest concern was Union Bank & Trust's liquidity, and stated that a "liquidity event" would "cause a need to do some kind of resolution quickly, and would not be orderly," but noted that "a large tax refund in the second quarter will help cushion liquidity." *Id.* at 95, 97. The FDIC told the Board that it should follow a "dual track," that is, to continue pursuing its recapitalization plan and TARP policy changes on one track while also preparing for FDIC intervention by taking actions to protect uninsured depositors, particularly public funds held at Union Bank & Trust. *Id.* at 97.

At that point in the meeting, the Board asked Irwin's officers, including Mr. Miller and Mr. Ehlinger, to come into the room and the Board conveyed the regulators' messages and the possible implications for Irwin and Union Savings & Trust. *Id.* at 99. The Board then directed management to pursue a "dual track mode – i) secure new

23

capital with a government partnership, or ii) manage a resolution process." *Id.* at 100.
The Board further "directed management to pursue its policy approach with the U.S.
Treasury," but also to do what could be done "to mitigate negative outcomes of a [FDIC]
resolution for stakeholders [by] get[ting] as many depositors into insured accounts as
possible." *Id.* The Board told management "to ensure as much of a soft landing as
possible for stakeholders." *Id.* at 102. The Board also asked Mr. Cohen to "advise them
on Director responsibilities with regard to an FDIC resolution action." *Id.* Mr. Cohen
stated that "the Board's actions to date have been a model for how to respond." *Id.* The
tax refund referenced by the Reserve Bank in the meeting held outside the presence of the
interested officers was not further addressed at the May 7, 2009 meeting.

The next week, on May 14, 2009, Mr. Miller updated the Board on the planned
use of the expected tax refund, stating: "[W]e should be receiving $76 million by late
June, of which approximately $74 million will go to [Union Bank & Trust] and the
remainder to [Union, FSB]." Defs.' Exh. H at 82. Mr. Cohen advised the Board that his
post-TARP viability proposal was "creating some interest" and that one federal banking
agency was advocating the same approach, although government officials could not agree
on how large the private match should be. Defs.' Exh. I-2 at 107. In response to a
question from the Board regarding potential liability under the current circumstances, Mr.
Cohen and his colleague Bill Kroehner from Sullivan & Cromwell stated that "the Board
and management have been very diligent in trying to work through the restructuring plan
and have not shied away from any effort that was at all possible and appropriate." *Id.* at

107-08.  Mr. Cohen added that, "if he thought there was something more [Irwin] should be doing, he would have spoken up and said so." *Id.*

On June 2, 2009, Irwin received mixed messages from the Bank Reserve and DFI. The regulators jointly sent a letter to the Board stating that Union Bank & Trust's "likelihood of failure is imminent."  Defs.' Exh. M at 98-99.  However, later in the day, Mr. Cohen reported to the Board that he had discussed the letter with the Bank Reserve, who clarified that they were "not saying the Bank is in imminent danger of failure." Defs.' Exh. I-2 at 115.

The June 2 letter also indicated that the regulatory agencies believed Irwin's "viability" target of raising $150 million in capital had moved to "substantially more than $150 million," but the letter did not identify an updated viability target.  Defs.' Exh. M at 98-99.  At the June 2, 2009 Board meeting, Mr. Ehlinger informed the Board that Irwin's internal projections suggested it would require $175 million to remain viable; Mr. Miller indicated that a new investor had recently approached him about a possible $5 to $8 million investment in Irwin, which would push expectations for a private capital raise to approximately $60 million.  When asked about the likelihood of raising $200 to $250 million, Mr. Miller stated that "$210 million is probably a realistic number if the Treasury supplies $150 million of it [through TARP approval]."  Defs.' Exh. I-2 at 116-17.

Mr. Cohen then advised the Board that, to pursue private capital and TARP in good faith, they would need to confirm that the Bank Reserve agreed that such a projection was both plausible and would satisfy its own "viability" analysis.  *Id.* at 117.

25

Mr. Cohen told the Board that Union Bank & Trust needed to be "adequately capitalized" through June 30, 2009 in order to give him another 50 to 80 days to work with Treasury. *Id.* He further stated that the post-TARP viability standard "is the correct standard and is supported with very strong arguments." *Id.* at 118. Mr. Cohen recognized that "[t]his does not mean it will be accepted[,] but it does mean there is a reasonable possibility." *Id.* Contrary to Mr. Cohen's optimistic view of his TARP proposal's chance of success, in a letter dated June 8, 2009, Reserve Bank and DFI regulators informed the Board that Irwin's capital proposal was unacceptable to the regulatory agencies in part because it was "totally dependent on approval of a non-existent government program," to wit, a program to be based on a post-TARP infusion viability analysis. Tr. Exh. E2 at 88.

### 11. June 2009 Tax Refund

A few days later, Mr. Miller informed the Board that "[w]e received our $76 million tax refund late today (Thursday, June 6), which is ahead of schedule and great news for liquidity." Defs.' Exh. H at 100. Specifically, Irwin received a federal tax refund in the sum of $76,151,784.00. Tr. Exh. L at 92. On June 11, 2009, Irwin "downstreamed" $74,088,071.00 of the refund to Union Bank & Trust and the rest to Union FSB. Tr. Exh. N.

### 12. $3.5 Million June 2009 Capital Contribution

Irwin's management continued to "seek ways to shrink the balance sheet to allow the Bank to remain adequately Capitalized [through] June 30" by selling Irwin's assets and downstreaming the resulting cash to Union Bank & Trust. Defs.' Exh. H at 90. In June 2009, Mr. Miller suggested that the Board could "approve an investment by the

26

parent company [Irwin] of approximately $3.75 million [of cash generated from asset sales] in Irwin Union Bank and Trust Company on or about, but no later than, June 30." Defs.' Exh. J at 115.  At the Board's June 26, 2009 meeting, after confirming with Mr. Cohen that the Board "has a responsibility to take actions that create the best circumstances for [Union Bank & Trust] to be Adequately Capitalized as of June 30," the Board approved the asset sale and "authorized the infusion of proceeds from this transaction by [Irwin] into [Union Bank & Trust] prior to the end of June and the Board directed management to complete all book entries with regard to this capital infusion into [Union Bank & Trust] prior to the end of June 30 as well."  Defs.' Exh. I-2 at 123.  This is the $3.5 million June 2009 capital contribution currently being challenged by the Trustee in this litigation.

### 13.    TARP Update – July 2009 through August 2009

In July 2009, Mr. Cohen advised the Board that Treasury and the Obama Administration expressed "serious interest" in helping small and medium-sized banks and "post-TARP viability and private equity components."  *Id.* at 132.  In mid-July, he updated the Board on media reports about "a 'Plan C' in the U.S. Treasury for addressing issues impacting small and medium-sized banks."  *Id.* at 135.  Mr. Cohen informed the Board that "[t]his matter was discussed at Treasury this week," and "[a]t least one of the alternatives is to apply a post-TARP criterion for investment viability."  *Id.*

At the July 24, 2009 Board meeting, the Board asked Mr. Cohen "if there was an alternative course of action that has not been identified by management."  *Id.* at 140.  Mr. Cohen responded "that he does not know of additional things that could be done now

27

other than what management is doing." *Id.* At the July 31, 2009 Board meeting, Mr. Cohen reported on his discussions with Treasury and stated: "There is some sense that Treasury would be interested in whether private equity funds would invest in banks that are TARP recipients on a post-viability basis." *Id.* at 142.

### 14. $30 Million Debt-to-Equity Conversion

Since 2002, Union Bank & Trust owed Irwin approximately $30 million in "subdebt," that is, Irwin had previously taken out a $30 million loan and delivered the proceeds to Union Bank & Trust in exchange for two separate notes totaling $30 million from the Bank. Defs.' Exh. K at 7-24. In an attempt to keep Union Bank & Trust capitalized, management recommended converting the $30 million debt into equity at Union Bank & Trust to help buoy the Banks' capital levels. Defs.' Exh. H at 121. Because the subdebt was approaching five years from maturity, Union Bank & Trust would have lost the ability to classify the entire amount as Tier 2 capital – in other words, doing nothing would have harmed the Bank's capital levels. Defs.' Exh. Q ¶ 21. The Board subsequently discussed and approved the proposal on the grounds that the equity contribution was "critical to maintain adequate capitalization at the Bank." Defs.' Exh. I-2 at 145.

Even as late as August 13, 2009, following effectuation of the equity conversion, Mr. Cohen reported that "Treasury is preparing a plan for small and community banks that will have elements for both post-TARP viability and private equity investment." Defs.' Exh. H at 130. However, in the end, Irwin's TARP application was never

approved and no further capital infusions were made prior to the closing of the Banks and Irwin's declared bankruptcy, on September 18, 2009.

**B.     Analysis**

The Trustee alleges that Defendants Miller and Ehlinger breached their fiduciary duties owed to Irwin by failing to exercise due care and undivided loyalty in causing the bank holding company to invest new capital in the Banks when they knew or should have known that the Banks had no chance of survival.

To succeed on a state-law claim for breach of fiduciary duty, the Trustee must establish: "(1) the existence of a fiduciary relationship; (2) a breach of the duty owed by the fiduciary to the beneficiary; and (3) harm to the beneficiary." *Good v. Indiana Teachers Retirement Fund*, 31 N.E.3d 978, 983 (Ind. Ct. App. 2015) (quoting *York v. Fredrick*, 947 N.E.2d 969, 978 (Ind. Ct. App. 2011)).

In Indiana, both corporate directors and corporate officers owe fiduciary duties to the corporation for whom they serve.  *See e.g., Biberstine v. New York Blower Co.,* 625 N.E.2d 1308, 1318 (Ind. Ct. App. 1993); *Griffin v. Carmel Bank & Trust Co.,* 510 N.E.2d 178, 182 (Ind. Ct. App. 1987) ("[D]irectors and officers of a corporation act in a fiduciary capacity…"); *Yerke v. Batman,* 376 N.E.2d 1211, 1214 (Ind. Ct. App. 1978) ("[C]oncerning matters affecting the general well being of the corporation, the officers and directors are fiduciaries to the corporation.").  However, while the duties of directors are statutory, "the personal liability of corporate officers ... is determined by common law rules of agency." *Winkler v. V.G. Reed & Sons, Inc.,* 638 N.E.2d 1228, 1231 (Ind. 1994)

(internal citations omitted); *see also* Ind. Code § 23–1–36–2, official comments (declining to codify standards of conduct for officers and leaving common law agency and contract principles as "the source of the duty of care owed to a corporation by an officer.").

Accordingly, corporate officers must abide by the Indiana's common-law doctrine, under which, "[t]he fiduciary has a duty to deal fairly, honestly, and openly with his corporation and…must not be distracted from the performance of his official duties by personal interests." *Rapkin Group, Inc. v. Cardinal Ventures, Inc.*, 29 N.E.3d 752, 757 (Ind. Ct. App. 2015) (citing *G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227, 240 (Ind. 2001)). It has been said that, "these duties include a duty of care," *Marwil v. Grubbs*, 2004 WL 2278751, at *7 (S.D. Ind. Sept. 30, 2004), as well as a duty of "utmost good faith and loyalty." *Barth v. Barth,* 659 N.E.2d 559, 561 n. 6 (Ind.1995).  Moreover, because "officers are chosen by, report to and are subject to the direction of the board of directors," Official Comment to Ind. Code § 23–1–36–2, they have "a duty to comply with all lawful instructions received [by the Board] … concerning the agent's actions on behalf of the principal."  Restatement (Third) of Agency § 8.09(2) (2006).  This is true even if "the agent believes that doing otherwise would be better for the principal."  *Id.* cmt. c.

We hold that Defendants are entitled to summary judgment on this claim because the undisputed evidence establishes that at all times they kept the Board informed of all relevant facts relating to the challenged contributions and that the Board, based on that

information as well as information from independent legal counsel and direct communications with bank regulators, exercised its own business judgment when it authorized Defendants to pay the distributions at issue. After the Board made its decisions, Defendants were duty-bound to carry out the Board's instructions.

The undisputed evidence before us establishes that as early as February 2008, the Board was focused on ensuring that the Banks remained "adequately capitalized." In its joint resolution adopted on February 27, 2008, the Board "recognize[d] the importance of ensuring that the enterprise maintains adequate capital to support its business operations" and "that, from a society stakeholder perspective, a financial institution's capital adequacy promotes public confidence in the institution itself and in the banking system as a whole." Defs.' Exh. I-1 at 7-8. The evidence clearly demonstrates that in designating this priority, the Board was responding to concerns raised by bank regulators regarding Union Bank & Trust's capital and liquidity "and the parent company's expected role as a source of strength for the Bank." *Id.* at 3.

At the time the Board considered and approved the 2009 capital contributions, Irwin, as a bank holding company, was subject to various federal banking laws and regulations, including the "source of strength" doctrine. Federal Reserve Board regulations explicitly required that: "A bank holding company shall serve as a source of financial and managerial strength to its subsidiary banks and shall not conduct its operations in an unsafe or unsound manner." 12 C.F.R. § 225.4(a)(1). The Federal Reserve's 1987 policy statement addressing these obligations further provided that "in

31

serving as a source of strength to its subsidiary banks, a bank holding company should …
provide adequate capital funds to its subsidiary banks during periods of financial stress or
adversity.  *Policy Statement; Responsibility of Bank Holding Companies to Act as
Sources of Strength to Their Subsidiary Banks*, 52 Fed. Reg. 15707-01 (April 30, 1987).

It was against the backdrop of this regulatory scheme that both the Board and
Defendants carried out their ongoing duties.  While we agree with the Trustee that, at the
time the Board authorized the capital contributions, these regulations did not *compel*
Irwin to downstream funds to the Banks,[6] both Defendants and the Board were entitled to
consider these regulations and policies, including the source of strength doctrine, in their
decisionmaking.  There is no indication that Defendants ever misrepresented the
character or enforceability of these regulations in making recommendations to the Board
regarding the capital contributions.[7]  Moreover, the evidence shows that the information

---

[6] The source of strength doctrine was subsequently codified as Section 616(d) of the Dodd-Frank
Act, which provides in relevant part that "the appropriate Federal banking agency for a bank
holding company or a savings and loan holding company shall require the bank holding company
or savings and loan holding company to serve as a source of financial strength for any subsidiary
of the bank holding company or savings and loan holding company that is a depository
institution."  This statute was not in effect, however, at the time of the 2009 capital contributions.
[7] The Trustee cites the Fifth Circuit's decision in *MCorp. Financial Inc. v. Board of Govrnors
Federal Reserve system of the United States*, 900 F.2d 852, 863 (5th Cir. 1990) ("*MCorp I*")
*aff'd in part, rev'd in part*, 502 U.S. 32 (1991) ("*MCorp II*"), as well as the decisions in *In re
Colonial BancGroup, Inc.*, 436 B.R. 713 (Bankr. M.D. Ala. 2010) and *FDIC v. AmFin Fin.
Corp.*, No. 1:10-cv-1298, 2011 WL 2200387 (N.D. Ohio June 6, 2011) for the proposition that
Defendants should have known that the source of strength doctrine was unenforceable when
Irwin made the 2009 capital contributions.  However, *In re Colonial* and *AmFin* were both
decided after those contributions were made and therefore cannot serve as support for an
argument that Defendants (and the Board) should have known the doctrine was unenforceable at
that time.  The Supreme Court subsequently reversed and vacated the Fifth Circuit's decision in
*MCorp* on the grounds that the district court lacked jurisdiction.  *See MCorp II*, 502 U.S. at 34.
Accordingly, the most that can be said about the enforceability of the source of strength doctrine
at the time the 2009 capital contributions were made is that it was unclear.  This is insufficient to

the Board received from direct communications with the bank regulators and the advice it

received from its independent counsel on these issues aligned with Defendants'

recommendations.

Nor is there any evidence that Defendants concealed pertinent information from

the Board or otherwise misled the Board in any way regarding the dire financial situation

the Banks faced before or in connection with each decision made by the Board to infuse

additional capital into Union Bank & Trust such that they could be found to have violated

their duty of care or loyalty to Irwin.  It is undisputed that Mr. Miller had informed the

Board in October 2008 that if Union Bank & Trust ever fell below "well capitalized," that

it would be unlikely to survive; that Defendants advised the Board in November 2008

that banks with a 4 or 5 CAMELS rating would be considered for TARP only as part of

an acquisition; and that the Board knew both that Union Bank & Trust had been

downgraded from a CAMELS 4 to a CAMELS 5 rating in December 2008 and that a

CAMELS 5 rating had negative implications as to a bank's likelihood for survival.  Not

only was the Board aware of these facts but it also discussed the implications of these

realities with independent counsel on numerous occasions and worried over their

consquences.

Contrary to the Trustee's argument, there is no evidence that the Board was acting

pursuant to a request from Defendants as opposed to exercising its own business

---

show that Defendants' and the Board's consideration of the doctrine and other relevant banking
regulations was unreasonable or constituted a breach of fiduciary duty.

judgment when it approved the January 2009 $14 million capital contribution.  Rather, the minutes from the December 4, 2008 Board meeting specifically state that the Board expected further efforts of management to preserve capital through various means, including "parent contribution to equity capital where necessary."  Defs.' Exh. I-2 at 32. The minutes further state that the Board then "authorized management to move additional equity capital from Irwin Financial Corporation into [Union Bank & Trust] prior to year-end and as necessary in order to maintain the well capitalized status of the bank."  *Id.* at 34.  We simply have found no indication that Defendants requested this approval or otherwise had their thumbs on the scale as the Board weighed the decision in a manner sufficient to establish a breach of their fiduciary duties.

The Trustee nevertheless contends that Defendants withheld from the Board material information regarding an accounting issue at the December 4, 2008 meeting at which the Board authorized the January 2009 $14 million capital contribution.  This cannot have been true, since the undisputed facts establish that this accounting issue did not even come to light until mid-January 2009 and in any event it related to a transaction that had occurred in late December 2008, more than one month after the Board's December 4 meeting.  Defendants therefore could not have concealed this information from the Board at the December 4 meeting because the issue had not yet arisen.  As soon as management learned of the potential accounting problem, Mr. Ehlinger informed the Board at its January 23, 2009 meeting and advised that a change in the accounting treatment "would push [Union Bank & Trust's capital] ratios below well capitalized" as

of December 31, 2008.  Defs.' Exh. I-2 at 73.  Therefore, although the issue was not ultimately resolved until March 20, 2009, the detailed factual recital we have provided in this ruling makes clear that the Board was kept informed through a long series of frequent meetings with and by Defendants regarding the negative effect an unfavorable resolution would, and ultimately, did, have on Union Bank & Trust's capitalization.

The Trustee next argues that Defendants breached their fiduciary duties of care and loyalty with regard to the June 2009 tax refund, given that there is no evidence that the Board authorized Defendants to transfer those funds to the Banks or that Defendants ever consulted the Board regarding the transfer.  There is no dispute, however, that the Board had approved the Tax Allocation Agreement in January 2009, as it had done each year since 1999.  Defendants maintain that this Agreement reflects the Board's direction that Irwin's subsidiary banks were to receive whatever portion of the tax refund was attributable to their carryback losses and that Defendants therefore needed no further direction or authorization.  According to Defendants, the Agreement was intended to be and they believed that it was in compliance with the bank regulators' policy on consolidated income tax allocation[8] which requires a holding company to hold a tax refund "as agent for the consolidated group on behalf of the group members" and

---

[8] The cases Trustee cites in support of its argument that the Tax Allocation Agreement may be susceptible to an alternative interpretation, namely, *Siegel v. FDIC* (*In re IndyMac Bancorp., Inc.*), No. 2:09-ap-01698-BB, 2012 WL 1037481 (Bankr. C.D. Cal. Mar. 29, 2012) and *Imperial Capital Bancorp, Inc. v. FDIC*, 492 F.R. 25 (S.D. Cal. 2013), were decided in 2012 or later, three years after the June 2009 tax return was transferred from Irwin to the Banks.  There is no indication that at the time the transfer was made either Mr. Miller or Mr. Ehlinger were aware of conflicting legal opinions regarding the interpretation of the Tax Allocation Agreement.

prohibits the holding company from "characterize[ing] refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent." *Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure*, 63 Fed. Reg. 64757-01. The policy also provides that "[a]ny practice that is not consistent with this policy statement may be viewed as an unsafe and unsound practice prompting either informal or formal corrective action." *Id.*

Although it is true, as the Trustee argues, that there is no direct evidence that the Board explicitly authorized the transfer of the June 2009 tax return to the Banks, the abundance of circumstantial evidence in the record persuades us that both the Board and Defendants understood the Tax Allocation Agreement to do just that. It is undisputed that, after the Board approved the Agreement, Defendants continually updated the Board regarding the expected amount of the tax refund, when it was expected to be received, and the intent to use the tax refund to provide additional liquidity for the Banks. Therefore, if the distribution of the tax refund to the Banks had been in contravention of the Board's understanding of the meaning of the Agreement or did not otherwise align with its prior directions to management, implicit or otherwise, the Board had ample opportunity to clarify its directive. The fact that it did not do so establishes that the transfer of the June 2009 tax return to the Banks was, in fact, made at the Board's direction and with its approval.[9]

---

[9] The fact that, as part of a global settlement, the FDIC, on behalf of the Banks, settled a claim against the Trustee in a dispute over ownership of additional tax refunds pursuant to which the Trustee received economic value representing at least 30% of the disputed tax refunds for the

Similarly, the evidence establishes that in making the June 2009 $3.5 million capital contribution, Defendants were once again acting at the direction of the Board.  At the June 26, 2009 Board meeting, in consulting with its independent counsel about potential asset transactions, the Board "noted that it has a responsibility to take actions that create the best circumstances for [Union Bank & Trust] to be Adequately capitalized as of June 30.  Therefore, it is appropriate to move forward with the proposed transactions at the best price achievable so that [Union Bank & Trust's] capital status can remain Adequate through quarter-end."  Defs.' Exh. I-2 at 123.  Mr. Cohen, the Board's independent counsel, confirmed that it was "correct for the Board to consider its responsibilities in this regard."  *Id.*

Far from concealing any relevant facts regarding the circumstances facing Union Bank & Trust at that time, at the June 2, 2009 Board meeting, Mr. Miller had informed the Board that bank regulators had increased the amount of capital that Irwin needed to raise for viability from $150 million to the $200-$250 million range.  *Id.* at 115. Additionally, directly following the Board's discussion at the June 26 meeting regarding the need to keep Union Bank & Trust "adequately capitalized," Mr. Ehlinger informed the Board that if it approved the pending asset sale, the sale would be at a discounted price.  He also told the Board that he would then anticipate downstreaming the sale proceeds to Union Bank & Trust by June 30, which was in line with the Board's

---

benefit of the Irwin bankruptcy estate, even if admissible, is not relevant to show the parties' understanding of the Tax Allocation Agreement at the time of the 2009 tax return.

previously expressed capitalization plan supported by its independent counsel. *Id.* at 123. Thereafter, the Board voted to approve the sale at a discounted price and "authorized the infusion of proceeds from this transaction by [Irwin] into [Union Bank & Trust] prior to the end of June 30 and the Board directed management to complete all book entries with regard to this capital infusion into [Union Bank & Trust] prior to the end of June 30 as well." *Id.* at 124. These facts clearly establish that in subsequently effecting the transfer of the June 2009 $3.5 million capital contribution, Defendants were in all respects carrying out the directive of the Board and that the Board's decision was based, not on the recommendation or urging of Defendants, but pursuant to the Board's "overall program to maintain the Adequate capitalization of [Union Bank & Trust] and therefore the solvency of [Union Bank & Trust] and [Irwin]." *Id.* at 123.

Thus, we find there is no evidence to support the Trustee's assertion that Defendants "were executing their own agenda" for Union Bank & Trust when they acted at the Board's direction in making the 2009 capital contributions and distributions. Rather, the evidence convincingly establishes that Defendants at all times were acting at the behest of and with the knowledge of the Board, and, as officers, were obligated to carry out the Board's directives, which they faithfully did. Defendants kept the Board regularly informed of the facts material to the 2009 transfers. Nothing evidences any dishonest actions or efforts to conceal information in order to benefit Union Bank & Trust or for their own personal gain. Based on the information provided by Defendants as well as advice from its independent counsel and information gleaned from direct

communications with bank regulators, the Board exercised its own business judgment.

For these reasons, Defendants fully satisfied their fiduciary duties of care and loyalty and

therefore are entitled to summary judgment on Count II.

## IV.   Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is

<u>GRANTED</u>.  Final judgment shall enter accordingly.

**IT IS SO ORDERED.**

Date:   3/31/2017

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Robert C. Allega
INDIANA ATTORNEY GENERAL
Robert.Allega@atg.in.gov

Sara Teresa Martin
INDIANA ATTORNEY GENERAL
sara.martin@atg.in.gov

Susan A. Cahoon
KILPATRICK STOCKTON LLP
scahoon@kilpatrickstockton.com

Alfred S. Lurey
KILPATRICK STOCKTON, LLP
alurey@kilpatricktownsend.com

Michael D. Langford
KILPATRICK TOWNSEND & STOCKTON LLP
mlangford@kilpatricktownsend.com

Ronald L. Raider
KILPATRICK TOWNSEND & STOCKTON LLP
rraider@kilpatricktownsend.com

Todd C. Meyers
KILPATRICK TOWNSEND & STOCKTON LLP
TMeyers@Kilpatricktownsend.com

David E. Wright
KROGER GARDIS & REGAS LLP
dew@kgrlaw.com

Kevin Dale Koons
KROGER GARDIS & REGAS LLP
kdk@kgrlaw.com

Steven E. Runyan
KROGER GARDIS & REGAS LLP
ser@kgrlaw.com

James A. Knauer
KROGER GARDIS & REGAS, LLP
jak@kgrlaw.com

Elliott D. Levin
RUBIN & LEVIN, P.C. - Penn. St.
edl@rubin-levin.net

John C. Hoard
RUBIN & LEVIN, P.C. - Penn. St.
johnh@rubin-levin.net